UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| TERRY RATHKE, for BOYD RATHKE, deceased,<br><br>              Plaintiff,<br><br>   vs.<br><br>ANDREW M. SAUL, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>              Defendant. | 5:19-CV-05006-KES<br><br><br><br>MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER |

Plaintiff, Terry Rathke,[1] seeks review of the decision of the Commissioner of the Social Security Administration denying her husband's claim for disability insurance benefits (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423. Docket 24. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. Docket 27. For the following reasons, the court affirms the decision of the Commissioner.

## PROCEDURAL HISTORY

Boyd Rathke initially filed for SSDI benefits on July 10, 1996 in the state of Washington. AR 164-67. The Commissioner denied his claim on December 11, 1996. AR 43. Rathke filed a second claim for disability on December 18,

---

[1] Terry Rathke, Boyd Rathke's wife, brought this action on behalf of Boyd Rathke (Rathke), who is now deceased. Rathke passed away on April 16, 2013. AR 1683.

1998. AR 168-70. The Commissioner denied his claim on May 10, 1999. AR 45. Rathke filed a third claim for SSDI benefits on February 24, 2003, alleging disability since March 15, 1993. AR 172. The Commissioner denied his claim initially on September 12, 2003, and upon reconsideration on February 26, 2004. AR 83-86, 90-92. Rathke then appeared before Administrative Law Judge (ALJ) Larry Donovan on February 16, 2005. AR 763-93. ALJ Donovan issued an opinion affirming the denial of benefits on April 4, 2005. AR 49-60. On May 23, 2005, Rathke requested the Appeals Council review the ALJ decision. AR 127. The Appeals Council granted Rathke's request for review on April 7, 2006. AR 61-64. The Appeals Council remanded the case for reconsideration of Rathke's other alleged impairments and an adequate evaluation of the treating and examining source opinions. *Id.*

Rathke then appeared with counsel at the supplemental hearing before ALJ Donovan on October 12, 2006. AR 794-837. ALJ Donovan issued an opinion affirming the denial of benefits on November 21, 2006. AR 24-42. The Appeals Council denied Rathke's request for further review on June 6, 2008 and September 30, 2008. AR 10-19. On November 4, 2008, Rathke appealed the decision to district court. AR 906, 1575. After appealing to district court, Rathke filed a new, subsequent application for SSDI benefits on December 12, 2008. AR 1012.

The district court reversed and remanded ALJ Donovan's decision on March 26, 2010. AR 996-1008. The Appeals Council issued a remand order for further proceedings consistent with the district court decision on June 22,

2010. AR 1009-12. The Appeals Council also ordered Rathke's December 12, 2008 application duplicative. AR 1012. This claim was thus consolidated with Rathke's initial claim. *Id.*

Rathke then appeared with counsel before ALJ James W. Olson on January 13, 2011. AR 1358-90. ALJ Olson issued an opinion affirming the denial of benefits on August 18, 2011. AR 873-894. The Appeals Council denied Rathke's request for review on September 9, 2013. AR 838-42. Rathke appealed the decision for a second time to district court on October 18, 2013. AR 1568. The district court reversed and remanded the ALJ's decision on September 4, 2015. AR 1580-1601. The court found that the 2011 opinion of ALJ Olson did not fully comply with the first district court remand. *See* AR 1581-1601. On October 8, 2015, the Appeals Council issued a remand order for further proceedings consistent with the district court decision. AR 1608.

Another hearing was held on January 12, 2017. AR 1498-1566. ALJ Michele M. Kelley issued an opinion affirming the denial of benefits on August 16, 2017. AR 1461-93. The Appeals Council denied Rathke's request for review on August 30, 2018. AR 1448-53. Thus, Rathke's appeal of the Commissioner's final decision is properly before the court under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

This case has a long history of litigation with multiple disability applications. The facts were outlined by Magistrate Judge Veronica L. Duffy in a Report and Recommendation filed January 27, 2010. *See* Report and Recommendation, *Rathke v. Astrue*, No. 5:08-CV-5084-JLV, Docket 22 at 6-51

(D.S.D. Jan. 27, 2010). In litigation that followed, the parties agreed to the statement of facts as previously outlined by Magistrate Judge Duffy, and also provided a joint statement of material facts that had developed after the Report and Recommendation. *See* Joint Statement of Material Facts, *Rathke v. Colvin*, No. 5:13-05076-JLV, Docket 18 at 1 (D.S.D. Mar. 6, 2014). On September 4, 2015, the district court incorporated by reference both the parties' joint statement of material facts and Magistrate Judge Duffy's prior iteration of the facts. *See id.*, Docket 27 at 4. The only new evidence that has been provided by the parties was the additional evidence and testimony received during the January 12, 2017 administrative hearing and medical interrogatories received after the hearing. *See* AR 1680-1708. Thus, the court incorporates by reference Magistrate Judge Duffy's prior statement of facts and the parties' previous joint statement of material facts. *See Rathke v. Astrue*, No. 5:08-CV-5084-JLV, Docket 22 at 6-51; *Rathke v. Colvin*, No. 5:13-05076-JLV, Docket 18. Any additional relevant facts are included in the discussion section of this order.

## ADMINISTRATIVE HEARING

During the administrative hearing, the ALJ heard testimony from Terry Rathke, Dr. Margaret Moore, Dr. Irving Belzer, and a vocational expert. AR 1498-1566.

First, Terry Rathke testified about her late husband's medical treatment. AR 1512. Specifically, Terry testified that in 2002, her husband did not want to go to the doctor because of the financial impact it would have on his wife. *Id.* Terry discussed how her husband would get stressed and sick about their

financial situation. AR 1513. She discussed how Rathke was not getting treatment for his hepatitis C because of the medication's potential side-effects on his anxiety and depression, and that he instead used marijuana to help stimulate his appetite to eat. *Id.* She testified that Rathke stopped using marijuana three to four months prior to his passing, and that once he stopped, he had a lot of anxiety and no appetite. AR 1513-14. Terry testified that during this time she observed her husband have the chills, sweats, and vomit. AR 1514-15. She testified that he would have one of these "spells" at least once a month from 2003 to 2013. AR 1515.

Terry also testified about her husband's social anxiety. AR 1515-17. She testified that they would sit in their car at football games and not go into the stands. AR 1517. She testified that Rathke could not handle crowds. *Id.* She also testified that her husband heard both male and female voices in his head, and that he felt like he had no control when the voices spoke to him. AR 1517-18. Specifically, Terry testified that a female voice would tell him to try to be more feminine, and that after hearing this voice her husband would physically hurt himself. AR 1519. Finally, Terry testified that when she first met her husband, he was a hard worker and always worked, but once his health declined, he was unable to work because he would get so sick. AR 1520.

Dr. Margaret Moore next testified as a medical expert. AR 1524. Dr. Moore first discussed listing 12.02, "related to organic mental disorder, cognitive problems, and things such as attention deficit in the adult era." AR 1526-27. Dr. Moore testified that in her opinion, the objective evidence in the

record does "not implicate . . . significant cognitive problems." *Id.* at 1527. Dr. Moore then discussed listing 12.03, "related to psychotic spectrum disorder ranging from psychotic disorders to schizophrenia[.]" AR 1527-28. Dr. Moore testified that in her opinion it was "really peculiar" that there was so much discussion mentioning schizophrenia from Rathke's primary care provider, Dr. Falkenberg. AR 1528. Dr. Moore testified that in her opinion Rathke never struck her as someone "who had a classic psychotic spectrum disorder." *Id.* Dr. Moore testified that in her opinion, Rathke's medical evidence is not indicative of "psychosis." *Id.*

Next, Dr. Moore discussed listing 12.04 "related to affective conditions" like depression. *Id.* Based on the medical evidence in the record, especially compounded by Rathke's physical health, Dr. Moore testified that she has "no doubt that [Rathke] was a man who was depressed[.]" AR 1529. Dr. Moore then discussed listing 12.06 "related to anxiety type diagnoses conditions." *Id.* Dr. Moore testified that in her opinion, Rathke's PTSD diagnosis "makes some sense." *Id.* Dr. Moore also discussed personality disorder within this listing. *Id.* Dr. Moore testified that as she looked at the record, she got a "very distinct sense of a personality disorder." AR 1530.

Finally, Dr. Moore testified about listing 12.09 related to "substance abuse." *Id.* In Dr. Moore's opinion, Rathke was an individual "with a long-term history of substance abuse." *Id.* Dr. Moore testified that Rathke's limitations "probably c[a]me more primarily from his personality disorder, the depression and the anxiety factor as opposed to the substance abuse." *Id.* Dr. Moore

testified that she is "not so much convinced there was a disability" in terms of Rathke's ADL (activities of daily living). *Id.* Dr. Moore stated that in her opinion Rathke's area of primary impairment was "social functioning." AR 1531-32. Dr. Moore stated that "I really saw across [Rathke's] record someone who just did not demonstrate motivation to get into the world of work," and that Rathke's primary limitation was his motivation. AR 1532. Dr. Moore testified that "from a mental health perspective," none of Rathke's impairments met or equaled any impairment described in the listing of impairments. AR 1534.

Dr. Irving Belzer next testified as a medical expert. AR 1540. Dr. Belzer testified that in his opinion Rathke suffered from two major areas of medical impairments from 2003-2013. AR 1541. The first area of impairment Dr. Belzer testified about was musculoskeletal. *Id.* Dr. Belzer noted an MRI of Rathke's left shoulder that showed a partial tear of the left supraspinatus and partial tear of the left infraspinatus muscle, likening the tears to bilateral rotator cuff tears. *Id.* Dr. Belzer noted that he was "not really told that [Rathke] ha[d] any problem using his arms." *Id.* Dr. Belzer also noted that he "didn't see any description that [Rathke] was having problems other than the fact that he was having pain in parts of his body, including his shoulder." *Id.* As to Rathke's musculoskeletal system, Dr. Belzer concluded that Rathke had shoulder and neck pain. AR 1541-42.

As to the gastrointestinal system, Dr. Belzer testified that Rathke had a history of hepatitis C and episodes of abdominal pain, nausea, vomiting, and fatigue. AR 1542-43. Dr. Belzer also noted that Rathke had a history of

pancreatitis. *Id.* Dr. Belzer noted that he specifically looked at listing "1.02B,

having to do with the problems with [Rathke's] shoulder" and listing "5.05,

[having] to do with hepatitis C [and] liver disease." *Id.* at 1544. Dr. Belzer noted

that in his opinion Rathke could lift "about twenty pounds occasionally and

maybe ten pounds frequently." AR 1546. He testified that "as far as [he] could

tell," Rathke could do shopping on his own, walk a block at a reasonable pace,

use public transportation, prepare a simple meal and feed himself, care for

personal hygiene, and sort, handle, or use paper files. AR 1548-49. Dr. Belzer

testified that in his opinion, however, none of Rathke's impairments combined

or separately met or equaled an impairment described in the listing of

impairments. AR 1544.

On cross-examination, Rathke's attorney asked Dr. Belzer if having sore

hands, fingers, and joints was consistent with the medical record. AR 1549. Dr.

Belzer testified that he did not "see any objective information" to support that

testimony. *Id.* Dr. Belzer noted that if Rathke had problems with the cervical

spine, those complaints may be consistent. AR 1549-50. But Dr. Belzer

testified that Rathke's subjective complaints about his hands and numbness

were not consistent with the x-rays and the medical evidence within the record.

*Id.* Dr. Belzer testified that in his opinion, the x-ray findings provided objective

evidence suggestive of neck problems only. *Id.*

Finally, William Tysdal served as the vocational expert at the hearing. AR

1464, 1552. Prior to Tysdal's testimony, Rathke's attorney objected to what the

vocational expert found to be Rathke's past work history. AR 1554. Rathke's

attorney noted that she believed Rathke last worked in 1999 and that it was her understanding that Rathke "always did just heavy manual work wherever he could find it." *Id.*

The ALJ then posed three hypotheticals. AR 1555-63. For the first hypothetical, the ALJ asked whether an individual with similar past work history, age, and educational background as Rathke, who could lift and carry, push and pull ten pounds frequently and twenty pounds occasionally, stand and walk for four hours, sit for six hours or about six hours, could not reach overhead bilaterally, but could reach in all other directions continuously, handle, finger, and feel frequently, push and pull frequently, with additional reaching, moving, and memory limitations, could perform any of Rathke's past jobs. AR 1555. The vocational expert stated that such an individual could not perform any of Rathke's past jobs. AR 1556. The ALJ then asked whether this individual could perform any other jobs in the national economy. *Id.* The vocational expert stated that "there would be unskilled work that individual could perform at the light level." AR 1557. The vocational expert stated that some examples would be an assembly machine tender, injection molding machine tender, inserting machine operator, or assembly press operator. *Id.*

For the second hypothetical, the individual was the same as the first but could lift and carry twenty-one to fifty pounds occasionally, twenty pounds frequently, sit for four hours at a time but for eight hours in an eight-hour workday, stand three hours at a time but for six hours in an eight-hour workday, walk three hours at a time, but for six hours in an eight-hour

workday, reach overhead with the right upper extremity, with additional reaching, moving, and memory limitations. AR 1558-59. The vocational expert testified that the individual could not perform any of Rathke's past work. AR 1559. The ALJ then asked whether this individual could perform any other jobs in the national economy. *Id.* The vocational expert stated the individual could work as a coffee maker, hand packager, or sweeper cleaner. *Id.* The vocational expert testified that this individual could perform any of the three jobs identified in addition to the four jobs identified in response to the first hypothetical. AR 1559-60.

For the third hypothetical, the individual was the same as the first but would be off task twenty percent of an eight-hour workday and a forty-hour workweek with normal breaks every two hours. AR 1560. The vocational expert stated this individual could not perform any of Rathke's past work. AR 1560-1561. The vocational expert also testified that there would be no jobs within the national economy that the individual could perform with that additional limitation. AR 1561.

Rathke's attorney asked the vocational expert if any of the jobs identified in response to the hypotheticals would be available to someone who needs breaks outside of the normal workday breaks. *Id.* The vocational expert stated "generally, no[.]" *Id.* Rathke's attorney asked how many absences would be tolerated before termination and if the individual would be allowed to lay down at any of the identified jobs. *Id.* The vocational expert stated that the individual could not miss more than "about one to two days per month" and would not be

able to lay down while performing the jobs. AR 1561-62. Rathke's attorney asked if any of the jobs identified in the first hypothetical require contact with coworkers. AR 1562. The vocational expert stated that interacting with coworkers would not be part of the job except a supervisor who the individual would occasionally have to accept instructions from, but that the individual would be in proximity to others while operating the machines. *Id.* Finally, Rathke's attorney asked what an assembly machine tender generally does and how many people an assembly machine tender works with. *Id.* The vocational expert stated that the worker positions different components onto a machine that then automatically assembles the components. AR 1563. The vocational expert also stated that the individual does not interact with others working on the line and instead is "working with one machine and that's what they interact with." *Id.* The record was left open at the end of the administrative hearing so that Rathke's attorney could submit medical interrogatories to Dr. Belzer or Dr. Moore. *Id.*

## ALJ DECISION

Employing the five-step analysis associated with an application for social security benefits, the ALJ denied Rathke's claim on August 16, 2017. AR 1461-93. At step one, the ALJ found that Rathke had not engaged in substantial gainful activity from his alleged onset date, February 24, 2003. AR 1468. At step two, the ALJ determined Rathke had the following severe impairments: major depression; post-traumatic stress disorder; anxiety; unspecified neurocognitive disorder; chronic obstructive pulmonary disease; right

supraspinatus tendon tear without retraction; left intersubstance and infraspinatus tendon tear; hepatitis C; and pancreatitis. *Id.*

At step three, the ALJ concluded Rathke did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 1470. At step four, the ALJ found Rathke had the residual functional capacity (RFC) to perform sedentary work with some limitations.[2] AR 1476. At step five, the ALJ found Rathke had no past relevant work. AR 1491. The ALJ held that based on Rathke's age, education, work experience, and RFC, Rathke was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. *Id.* Thus, the ALJ concluded that Rathke was not disabled under the Social Security Act. AR 1493.

---

[2] The ALJ found Rathke could lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally; could sit for about six hours in an eight-hour workday; could stand and walk for four hours in an eight-hour workday; could frequently push or pull with all upper extremities bilaterally; could frequently handle, finger, and feel bilaterally; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; occasionally be exposed to humidity, wetness, dust, odors, perfumes, pulmonary irritants, temperature extremes, and vibrations; could understand, remember, and carry out simple, routine, repetitive tasks; could maintain attention, concentration, persistence, and pace for such tasks for an eight-hour workday; and could tolerate occasional interaction with coworkers and supervisors but was unable to work in tandem with coworkers or supervisors. AR 1476. The ALJ found Rathke could not reach overhead bilaterally but could reach continuously in all other directions; needed to avoid concentrated exposure to unprotected heights, moving mechanical parts, operating a motor vehicle; was unable to tolerate any interaction with members of the public; was able to tolerate no more than rare changes in a routine work setting; and could make no more than rare decisions and judgments regarding simple, repetitive, routine tasks. *Id.*

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). " 'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the conclusion.' " *Teague*, 638 F.3d at 614 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). When reviewing the record, "the court 'must consider both evidence that supports and evidence that detracts from the Commissioner's decision.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction

of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

### THE FIVE STEP PROCEDURE FOR DISABILITY DETERMINATIONS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(3)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). An ALJ must apply a five-step procedure when determining if an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993). The steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b).

**Step Two**: Determine whether the applicant has an impairment or a combination of impairments that are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).

**Step Three**: Determine whether any of the severe impairments identified in Step Two match the listing in Appendix 1. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 416.920(d).

**Step Four**: Considering the applicant's RFC, determine whether the applicant can perform any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 416.920(g).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy that the applicant can perform. 20 C.F.R. § 404.1520(f); 20 C.F.R. § 416.920(f).

## DISCUSSION

Rathke urges the court to review the ALJ's decision for the following reasons: (1) the ALJ erred at Step Three in finding that Rathke's musculoskeletal impairments did not meet or equal listing 1.02B; (2) the ALJ erred in rejecting Rathke's credibility; and (3) the ALJ failed to consider the combined effects of Rathke's severe impairments when determining Rathke's RFC. Docket 24. The court will address these arguments in the order of the five-step procedure outlined above.

## I.    Step Three

At step three, the ALJ must determine whether the claimant's severe impairment or impairments are such that a finding of disability is appropriate. *See* 20 C.F.R. § 416.920(a)(4)(iii). If the claimant's severe impairments, individually or in combination, satisfy the requirements of a listing in Appendix 1 of Subpart P in 20 C.F.R. Part 404 (Appendix 1), then "the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). The determination is solely a medical determination, and the claimant bears the burden of showing that his impairment meets or equals a listed

impairment. *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998); *Cockerham v. Sullivan*, 895 F.2d 492, 496 (8th Cir. 1990). "[The] claimant . . . must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990) (emphasis in original); *see also Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). An impairment that only satisfies some of the listing's criteria, "no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.

Here, the ALJ found that Rathke did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1. AR 1470. Specifically, the ALJ concluded that Rathke's shoulder impairments did not meet listing 1.02B. *Id.* Rathke argues that the ALJ erred in finding that Rathke's musculoskeletal impairments did not meet or equal listing 1.02B. Docket 24 at 24-29.

In order to meet or equal listing 1.02B, a plaintiff must establish that the individual experienced the following:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. Part 404, Subpart P, App. 1, § 1.02. In addition to the criteria above, Rathke also must establish that his condition involved "one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively[.]" *Id.*

The inability to perform fine and gross movements effectively is defined as:

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.

*Id.* § 1.00B2c. Examples of the inability to perform fine and gross movements effectively include being unable to prepare simple meals, feed oneself, take care of personal hygiene, sort and handle papers or files, or place files in a filing cabinet at or above waist level. *Id.*

The Commissioner concedes that Rathke satisfies the first prong of this listing. Docket 27 at 7. But the Commissioner argues evidence does not show that he met the second prong of the listing. *Id.* Rathke argues that Dr. Belzer's later opinion and medical evidence in the record show that Rathke's musculoskeletal impairments equal listing 1.02B. Docket 24 at 26-27.

In regards to not satisfying listing 1.02B, the ALJ found that Rathke did not meet or equal the severity requirements of this listing because Rathke "retained the use of [his] upper extremities sufficient to carry out activities of daily living" as defined in § 1.00B2c. AR 1470. Rathke does not argue that the ALJ erred as to the ALJ's reliance on Rathke's daily activities. Instead, Rathke argues that the ALJ impermissibly discredited Dr. Belzer's later opinion and "misinterpreted the medical evidence" as to the x-rays of Rathke's hand and wrists. Docket 24 at 26-28. The court will address these arguments in turn.

## A.    Weight to Dr. Belzer's Later Opinion

Rathke first argues that the ALJ improperly rejected Dr. Belzer's opinion. *Id.* at 26, 29. In evaluating a testifying medical expert's medical opinion, an ALJ must consider the following factors: (1) the expert's medical specialty; (2) the supporting evidence in the record; (3) the supporting explanations provided by the expert; and (4) the consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(c)(2)(ii) (2012); *see also id.* § 404.1527(c). The ALJ gave significant weight to Dr. Belzer's hearing testimony and opinion because it was consistent with Rathke's medical records and treatment history. AR 1483. The ALJ gave minimal weight to Dr. Belzer's later opinion (AR 1693-96). AR 1487. The ALJ provided several reasons for giving this opinion minimal weight. *See* AR 1486-87.

First, the ALJ stated that Dr. Belzer's later opinion was inconsistent with his earlier testimony at the hearing. AR 1486. In his earlier opinion, Dr. Belzer testified that Rathke's impairments, combined or separate, did not meet or equal any listing of impairments. AR 1544. Dr. Belzer stated that he looked at listing 1.02B and found that Rathke's shoulder problems did not meet the criteria because he did not see "any significant description of problems with the use of the hands." *Id.* He also acknowledged the fact that Rathke may have experienced some hand problems due to the rotator cuff injury, but again, noted he did not see any description of that in the medical evidence. *Id.*; *see also* AR 1541 (testifying that he was not told that Rathke has problems using his arms); AR 1549-50 (stating he did not see any objective information to

support Rathke's subjective complaint of soreness and numbness in hands, fingers, joints).

In his later interrogatories, Dr. Belzer stated that Rathke's impairments, combined, equaled listing 1.02B. AR 1695. Dr. Belzer's conclusion was based on Rathke's rotator cuff tears that were complicated by his hepatitis C, significant fatigue, and organic mental disorder. AR 1694-95. The ALJ noted that Dr. Belzer provided no narrative discussion to clarify the differences in his inconsistent opinions. AR 1486-87.

In comparing the two opinions, Dr. Belzer provided inconsistent medical opinions. As noted by the ALJ, Dr. Belzer relied on the same evidence in his later interrogatories as he did for his testimony at the hearing. *Id.* Overall, the ALJ permissibly discounted Dr. Belzer's later testimony because it was inconsistent with his own earlier opinion. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (stating the ALJ may discount a physician's opinion when the physician has offered inconsistent opinions). Also, Dr. Belzer's failure to provide a supporting explanation for his change in position is another permissible reason for the ALJ to discount his opinion. *See* 20 C.F.R. § 404.1527(c)(2)(ii) (2012).

Second, the ALJ found that Dr. Belzer's later opinion was inconsistent with the record as a whole. AR 1487. The ALJ discounted Dr. Belzer's opinion to the extent that he reached his conclusion by considering a combination of impairments, specifically, Rathke's organic mental disorder. *Id.* The ALJ noted that Dr. Belzer's opinion was inconsistent with Dr. Moore's, a mental health

specialist (AR 1531-34; 1697-1705). *See* AR 1487. In Dr. Moore's opinion, Rathke's mental impairments, taken together, would allow Rathke to perform a range of unskilled work. *Id.* (citing AR 1699). Dr. Moore found that Rathke did not have any mental impairments that met any of the listings. AR 1699-1700. She stated, "[D]espite continuous use of cannabis and alcohol, plus prescription narcotics, claimant still was able to demonstrate low average abilities over all assessments." *Id.*; *see also* AR 1701 (stating the tasks and work conditions Rathke could handle). At the administrative hearing, Dr. Moore also testified that "from a mental health perspective," none of Rathke's impairments met or equaled any impairment described in the listing of impairments. AR 1534. This is inconsistent with Dr. Belzer's later opinion.

Third, the ALJ also noted that Dr. Belzer's opinion included a medical opinion on Rathke's mental health, but Dr. Belzer is not a mental health expert. AR 1487. Generally, more weight is given to the medical opinion of a specialist about medical issues that relate to his area of specialty. 20 C.F.R. § 404.1527(c)(5) (2012); *see Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (stating "[t]he ALJ was within his purview not to give these observations [of depression] much weight because they were not from specialists in the mental health field."). Here, Dr. Belzer's opinion was based on the premise that Rathke's organic mental disorder complicated his musculoskeletal impairment. AR 1694-95. But as noted by the ALJ, Dr. Belzer is an internal medicine specialist with a subspecialty in pulmonary medicine. AR 1481, 1487; *see also*

AR 1652-53. Because Dr. Belzer's opinion included an area that he is not an expert in, the ALJ permissibly gave it less weight.

Considering the record as a whole, the ALJ articulated permissible reasons for discrediting Dr. Belzer's later opinion. The court finds that Dr. Belzer's second opinion was inconsistent with other substantial evidence in the record and inconsistent with his own testimony. Thus, the ALJ did not err in giving Dr. Belzer's later opinion less weight.

### B.    X-Rays from 2002

Next, Rathke argues that evidence in the record supports the finding the Rathke's impairments equal listing 1.02 based on Rathke's hand problems that resulted in an inability to perform fine and gross movements. Docket 24 at 27-28. Rathke specifically relies on x-rays of Rathke's cervical spine, hand, and wrist. *Id.* Rathke contends that the ALJ misinterpreted the medical evidence because the ALJ did not consider all the x-rays. *Id.* at 28.

As to the cervical spine injury, the ALJ considered the x-ray and found that the cervical findings were considered non-severe. AR 1468-69. Dr. Arthur A. Castagno reviewed the x-ray of Rathke's cervical spine. AR 525. Dr. Castagno found that there was minor narrowing of the C4-5 disk level, but all of the disk spaces and vertebral body heights were normal. *Id.* The ALJ noted that Dr. Belzer's hearing testimony found the x-ray findings to be benign and unremarkable. AR 1468. Dr. Belzer testified that the "x-rays by themselves are not consistent with" numbness of the hands and are only "suggestive that [Rathke] may [had] problems with his cervical spine." AR 1550. Ultimately, the

ALJ acknowledged Rathke's neck and cervical pain but found there was no objective medical evidence in the record to support Rathke's alleged symptoms. AR 1468-69.

As to the September 2002 x-rays of Rathke's hands and wrists, the ALJ considered the x-rays but concluded that the findings were benign and unremarkable. AR 1469. The ALJ noted that the right wrist x-ray showed that there were dystrophic calcification changes in the ulnocarpal region but not the TFCC region. *See id.* (citing AR 524-25). In the x-ray of Rathke's right hand, however, the dystrophic calcification "appear[ed] to be" more in the TFCC region compared to the wrist x-ray. AR 526.

Rathke is correct that the ALJ did not specifically mention this hand x-ray and those findings. Docket 24 at 28. But substantial evidence in the record still supports the ALJ's finding because Dr. Castagno's overall impression of both the hand and wrist x-rays was that dystrophic calcification occurred. AR 524, 526. Dr. Belzer also reviewed all the medical evidence in the file, including these x-rays, and concluded that he did not find that Rathke had any problems with his hands. AR 1541, 1544, 1549-50. Overall, the ALJ limited Rathke to no more than frequent handling, fingering, and feeling bilaterally when considering Rathke's cervical degenerative disc disease in conjunction with the right wrist impairment. AR 1469, 1476.

All the evidence Rathke relies on is from a small window of time in 2002 and does not contain any medical finding that Rathke was unable to perform fine and gross movements as required by paragraph B from listing 1.02. *See*

Docket 24 at 7. Rathke cites medical notes from Dr. Camacho on August 20, 2002, where Rathke complained of pain in his wrist, hands, elbows, shoulders, and back. *Id.* (citing AR 521). Dr. Camacho's plan included giving Rathke a prescription for carpal tunnel syndrome. AR 519. Rathke also cites to Dr. Sherman's September 7, 2002 medical notes, where Dr. Sherman noted that Rathke complained of numbness, tingling, and pain in his hand. Docket 24 at 7 (citing AR 517). But Dr. Sherman stated that Rathke's elbows and wrist had a full range of motion and there was no synovialitis or tenderness in Rathke's hands or wrist joints. AR 517. Dr. Sherman attributed these issues to "[c]hronic upper extremity pain, likely arthritis[.]" *Id.*

All of this evidence does not contradict the ALJ's findings because nowhere in these notes does any doctor provide a medical opinion that Rathke's condition prevents him from doing fine or gross movements. The ALJ properly considered this evidence and found that no objective medical evidence demonstrated that Rathke's impairments satisfied listing 1.02B. *See Schultz v. Astrue*, 479 F.3d 979, 982-83 (8th Cir. 2007) (noting in analysis of § 1.00(B)(2)(b)(1) that doctors never imposed any specific limitation on the plaintiff's ability to walk, including on rough or uneven surfaces); *Coolley v. Colvin*, No. 5:15-CV-05001-JLV, 2016 WL 1171519, at *5-*6 (D.S.D. Mar. 24, 2016) (holding that listing 1.02 was not met when, despite the plaintiff's reports that she used a cane, walker, and motorized scooter, there was no evidence the plaintiff could not walk without the assistance of a walker because, rather, "it is her preference from time-to-time to use a walker or one

cane."); *Wegmann v. Astrue*, 2012 WL 6892804, at *9 (E.D. Mo. Dec. 27, 2012) (holding listing 1.02 not met in part because while doctor reported the plaintiff needed an assistive device, doctor did not opine that the plaintiff "could not walk"); *D'Angelo v. Astrue*, 2010 WL 1257682, at *25 (E.D. Mo. Mar. 25, 2010) (finding that listing 1.02 not met in part because although the medical records included references to plaintiff's complaints, no physician placed any permanent restriction on the plaintiff's walking or ambulation).

Substantial evidence in the record, specifically Rathke's daily activities and Dr. Belzer's hearing testimony, supports the ALJ's finding that Rathke's impairments did not meet or equal listing 1.02. Thus, considering the record as a whole, the ALJ did not err in giving little weight to the September 2002 x-rays.

## II.    Step Four

At step four, the Commissioner must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations. *Brown v. Barnhart*, 390 F.3d 535, 538-39 (8th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)(1)). The claimant's RFC is determined based on all relevant evidence in the record, including medical records, observations of treating physicians, and the individual's own description of his limitations. *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). But the ALJ's finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The ALJ's RFC evaluation must include a "narrative discussion" that

cites specific medical and non-medical evidence and explains how the evidence supports the ALJ's conclusions. SSR 96-8p, 1996 WL 374184 (July 2, 1996). Also, the ALJ must explain how any material inconsistencies or ambiguities in the record were considered and resolved. *Id.*

In determining Rathke's RFC, the ALJ considered Rathke's symptoms and whether they were consistent with the objective medical evidence, as well as the opinion evidence of several treating physicians. AR 1476-91. Rathke's final two issues pertain to the ALJ's RFC determination at step four. Docket 24 at 1. First, Rathke argues the ALJ erred in her handling of Rathke's subjective complaints and credibility. *Id.* Second, Rathke's argues the ALJ failed to consider the combined effects of Rathke's impairments. *Id.*

**A.    Subjective Complaints and Credibility**

Rathke argues that the ALJ erred in rejecting Rathke's credibility. Docket 24 at 29-33. "Symptoms such as pain are considered along with any impairments when determining a claimant's RFC." *Brown*, 390 F.3d at 541. In determining whether to fully credit a claimant's subjective complaints, the ALJ engages in a two-step process: (1) whether there is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See* SSR 16-3p, 2016 WL 1020935 (Mar. 16, 2016); 20 C.F.R. § 404.1529.

In evaluating the second step of the analysis, an ALJ must consider several factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) relevant work history; and (7) the lack of objective medical evidence to support the complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). A claimant's subjective complaints may be discredited only if they are inconsistent with the evidence as a whole. *Id.* The court will "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so," *Schultz*, 479 F.3d at 983 (internal quotation omitted), though the ALJ does not need to explicitly discuss each of the factors above. *Wildman*, 596 F.3d at 968 (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

Here, the ALJ found Rathke had medically determinable mental impairments that could reasonably be expected to produce his symptoms in accordance with the first step above. AR 1479. But the ALJ found that Rathke's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.* Regarding Rathke's subjective complaints and his credibility, Rathke disagrees with the ALJ's handling of the following issues: (1) the ALJ's explanation regarding Rathke's credibility; (2) evidence contradicting Rathke's subjective complaints; (3) consideration of evidence outside of the

relevant time period; (4) Rathke's daily activities; (5) handling of Terry Rathke's testimony; and (6) deference to the ALJ's decision. Docket 24 at 29-33.

### 1.    ALJ's Explanation on Credibility

First, Rathke argues that the ALJ did not provide an explanation on why his testimony or his wife's testimony regarding his anxiety and social isolation were not credible. Docket 24 at 30. Rathke contends that the ALJ did not point out any inconsistencies in Rathke's testimony or his wife's testimony regarding his anxiety and his social avoidance. *Id.*

Based on this court's review of the ALJ opinion, the court finds that the ALJ did not find Rathke and Terry Rathke's testimony regarding these issues to be "not credible." In fact, the ALJ included limitations in Rathke's RFC regarding these issues. *See* AR 1476.[3] In the opinion, the ALJ discussed in depth Rathke's anxiety disorder. AR 1474. It does not appear that the ALJ discredited or rejected Rathke and Terry Rathke's testimony regarding Rathke's anxiety. It appears that the ALJ considered Rathke, Terry Rathke's, and the medical experts' opinions in limiting Rathke's RFC. AR 1475; *see also* AR 1476. To the extent the ALJ's decision did not encompass the full severity of Rathke's testimony, the ALJ articulated that Rathke's complaints were inconsistent with his daily activities. AR 1478-79. Additionally, the ALJ noted that the medical

---

[3] For Rathke's RFC, the ALJ limited Rathke to the following in relation to his mental impairments and social functioning: able to tolerate occasional interaction with coworkers and supervisors (but unable to work in tandem with either coworkers or supervisors); unable to tolerate any interaction with members of the public as part of work duties; able to tolerate no more than rare changes in a routine work setting; and able to make no more than rare decisions and judgments regarding simple, repetitive routine tasks. AR 1476.

evidence in the record did not support the severity of Rathke's complaints as it pertained to his anxiety. *See* AR 1488.

In regards to not limiting Rathke's RFC to what Rathke testified to, the ALJ noted that the medical evidence in the record was inconsistent about the severity of his anxiety. AR 1472-73, 1474-75, 1489. The ALJ found that Dr. Joy Falkenburg provided inconsistent opinions regarding Rathke's anxiety. *See id.* In September and December of 2003, Rathke's anxiety was escalating and his anxiety medication was increased. AR 621, 670. On January 8, 2004, Rathke complained that his anxiety was much worse recently. AR 627, 755. But on January 16, 2004, just two weeks later, Dr. Falkenburg noted that Rathke's anxiety was controlled with medication and stable. AR 668, 756. On March 25, 2005, Dr. Falkenburg stated that Rathke's depression and psychosis were under control. AR 702. On April 4 and April 21, 2006, Dr. Falkenburg again observed that Rathke's anxiety was stable and well-controlled on his medication. AR 691, 761.

Two years later, on May 6, 2008, Dr. Falkenburg stated in a letter that Rathke's anxiety had him so disabled he could work. AR 728.[4] On July 8, 2008, Dr. Falkenburg wrote that Rathke's anxiety had worsened. AR 1219. Yet

---

[4] The ALJ permissibly gave less than controlling weight regarding this opinion in Dr. Falkenburg's letter. *See Bradley*, 528 F.3d at 1116 ("Doctor opinions on a patient's employment capability, *e.g.*, [claimant] was "incapable of gainful employment," are often not entitled to significant weight."); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner . . . .").

on September 23, 2008, Rathke's anxiety and moods were "pretty well controlled." AR 1213. Ultimately, the ALJ gave Dr. Falkenburg's opinion minimal weight because it was inconsistent with her other opinions. AR 1489. The ALJ thoroughly summarized Rathke's medical history, treatment records, and providers' opinions in determining the affect Rathke's anxiety has on his RFC. Thus, substantial evidence supports the ALJ's finding that Rathke's anxiety does limit his RFC but does not completely disable him because his anxiety can be well-controlled on medication.

As to Rathke's mental impairments, the ALJ found that Rathke had no more than moderate limitations in activities of daily living and social functioning/interaction based on the record. AR 1487. The ALJ gave considerable weight to medical opinions from Dr. Moore, a mental health specialist, that were inconsistent with Rathke's alleged complaints. AR 1474. Dr. Moore opined that Rathke had mild to moderate difficulties regarding daily living activities and Rathke's overall functioning in terms of daily life. AR 1531. Dr. Moore testified that Rathke was able to get up and go into the community in the morning, Rathke managed to spend time in jail without any apparent significant difficulty, and Rathke's hygiene problems stemmed more from his priorities and had less to do with his actual abilities. AR 1474 (citing AR 1531). Dr. Moore also testified that she did not think Rathke should have contact with the general public, that his interactions with his coworkers would be compromised, and that he would work best independently and alone. AR 1535.

The ALJ gave significant weight to Dr. Moore's opinion and limited Rathke's RFC to no more than occasional interaction with coworkers and supervisors. AR 1475. The ALJ also noted that Rathke would not be able to tolerate interactions with members of the public. *Id.* The ALJ properly considered Dr. Moore's testimony and medical opinion, the medical evidence throughout the record, and Rathke's own statements as to his mental impairments. Thus, the court disagrees with Rathke's argument that the ALJ rejected Rathke's testimony regarding his need for social isolation because it is evident the ALJ's RFC limitation acknowledges Rathke's need to work alone based on his social isolation complaints.

The ALJ also relied on Dr. Robert Pelc's opinions regarding Rathke's anxiety and social avoidance. AR 1490. The ALJ noted that Dr. Pelc acknowledged Rathke's difficulties with activities of daily living, his anxiety, and his avoidance of the public. *Id.* (citing AR 1337). Dr. Pelc found that impairment to Rathke's ability to interact with the public was marked, moderate as to coworkers and supervisors, moderate regarding complex instructions, but mild in handling simple tasks. AR 1337. As to Rathke's social functioning, Dr. Pelc found his limitation to be moderate. AR 1332.

Overall, the ALJ provided a detailed discussion of all the medical evidence in the record regarding Rathke's anxiety and social functioning. AR 1472-75. The ALJ permissibly discounted Rathke and his wife's testimony based on other factors besides inconsistency. In the decision, the ALJ discussed Rathke's daily activities, the effectiveness of the anxiety medication,

functional restrictions, and the lack of objective medical evidence to support his complaints. All of these are permissible reasons why the ALJ did not fully adopt Rathke's subjective complaints. *See Wildman*, 596 F.3d at 968. These reasons were provided throughout the ALJ's decision. Though the reasoning was not articulated as clearly as it could be, "a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case[.]" *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (internal quotations and citations omitted). The court will "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Schultz*, 479 F.3d at 983 (internal quotation omitted). Thus, the court finds that the ALJ did not err in providing her explanation on Rathke's credibility regarding his subjective complaints.

### 2. Evidence Contradicting Subjective Complaints

Second, Rathke argues that the ALJ rejected Rathke's credibility without discussing or citing any evidence that contradicted his testimony regarding his good and bad days, his need to take breaks, or his need to miss work. Docket 24 at 30. Rathke contends that there is no substantive evidence in the record to support this rejection.

Throughout the ALJ's opinion, the ALJ cited several medical opinions that did not support Rathke's subject complaints regarding his good and bad days, his flare ups, and other issues. For example, the ALJ discussed Rathke's complaint that many of his physical limitations were related to flares of his

hepatitis C and chronic pancreatitis. AR 1478. Additionally, the ALJ noted that Rathke stated he took numerous sick days stemming from his complications with his hepatitis C and pancreatitis. AR 1479. Nowhere in her opinion did the ALJ say she discounted Rathke's testimony regarding his flare ups.

Additionally, the ALJ discussed medical evidence that during one of Rathke's flare ups in 2004, the discharging doctor found that there was no evidence of acute pancreatitis and that Rathke's bouts of abdominal pain were not clearly related to hepatitis C. AR 1482 (citing AR 541, 625-26). Dr. Graber noted that he believed Rathke's abdominal pain was multifactorial. AR 626. Additionally, the ALJ noted Dr. Belzer's hearing testimony where Dr. Belzer testified that Rathke's bouts of acute pancreatitis were mostly limited to 2003. AR 1482 (citing AR 1542). Dr. Belzer stated that at no time did Rathke develop ascites or encephalopathy, he did not have a hemorrhage or become jaundiced, nor did he develop any significant concentration of hepatitis C that affected his liver. AR 1542, 1544. Also, the ALJ cited to two additional medical opinions that stated Rathke had no more than mild or moderate difficulties in activities of daily life. AR 1474 (citing AR 802-03, 1332).

Overall, the medical evidence relied upon by the ALJ supports the ALJ giving less weight to Rathke's complaints of constant, debilitating flare ups. *See Bradley*, 528 F.3d at 1115 (upholding the ALJ's adverse credibility finding of the claimant based on the lack of additional evidence corroborating the claimant's subjective complaints). The ALJ properly considered whether the objective evidence supported the degree of limitation alleged by Rathke. *See*

*Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (medical evidence "failed to provide strong support" for claimant's allegations of incapacitating symptoms and limitations); *Forte v. Barnhart,* 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider."). Thus, the court finds that the ALJ did not err because there is substantial evidence in the record that negates the severity of Rathke's subjective complaints.

### 3. Evidence Outside of Relevant Time Period

Third, Rathke argues that the ALJ relies on medical records from before Rathke's 2003 onset date in an attempt to show that Rathke's activities were inconsistent with his claim for disability. Docket 24 at 31. In her opinion, the ALJ cited to medical records from 1997 to 2002 and also discussed Rathke's activities during that time that were inconsistent with his complaints to his medical providers. AR 1480-81, 1487.

The Eighth Circuit has held that the ALJ is entitled to consider all evidence in the record. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005); *see also Tate v. Apfel*, 167 F.3d 1191, 1194 (8th Cir. 1999) (approving ALJ's consideration of all relevant medical evidence, regardless of date). Here, Rathke relied on medical evidence from 2002 to support his position that the pain in his cervical spine, shoulder, wrists, and hands prevented him from doing various activities. *See, e.g.*, Docket 24 at 7. Thus, the ALJ permissibly looked at Rathke's daily activities between the time Rathke developed these issues and the onset date to judge the credibility of Rathke's subjective complaints as it pertains to his alleged musculoskeletal

impairments. The ALJ also noted that "[g]iven more than a decade of subsequent medical evidence, limited weight" was given to older opinions and evaluations. AR 1487. The court finds that the ALJ did not err because "there is no valid reason to exclude consideration of medical records dated prior to [Rathke's] alleged date of onset." *Vandenboom*, 421 F.3d at 750; *see Wallace v. Astrue*, 2011 WL 1990147, at *15 (D. Minn. Feb. 25, 2011), *report and recommendation adopted,* 2011 WL 2014884 (D. Minn. May 23, 2011) ("As a preliminary issue, evidence prior to the alleged disability onset date may be relevant if there is no valid reason to exclude consideration of the evidence.").

### 4. Rathke's Daily Activities

Fourth, Rathke argues that Rathke does not need to show that his pain prevented him from all productive activity. Docket 24 at 32. "[I]nconsistencies between subjective complaints of pain and daily living patterns may . . . diminish credibility." *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (alterations in original) (internal quotation omitted). In assessing a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007).

The ALJ considered the fact that Rathke experienced bad days where he did not leave his chair, though depending on the severity of his symptoms on certain days, he could perform many daily living activities and hobbies because

he did not like to sit around all day. AR 1478. The ALJ also noted that Rathke testified he was able to drive, pick up his children from school a few days a week, perform quick and easy grocery shopping, prepare simple meals, had no difficulty putting on socks and shoes, brushing hair and teeth, and performing household chores like picking up dirty clothes, vacuuming, or washing dishes. *Id.* Additionally, the ALJ stated that Rathke testified that on good days, he would help his mother fix up the cabin by stuffing insulation or hanging sheetrock. *Id.* He also painted posters and made his own frames in his shop up until he stopped from the side effects of pain medication. *Id.*

The ALJ permissibly could have found all of these activities to be inconsistent with Rathke's complaints that he was unable to leave his chair. *See, e.g.*, *Ponder v. Colvin*, 770 F.3d 1190, 1195-96 (8th Cir. 2014) (holding the claimant's ability to perform light housework, wash dishes, handle money, leave her house, shop for groceries, watch TV, attend church, and visit family undermined her assertion of total disability); *Baker v. Barnhart*, 457 F.3d 882, 893 (8th Cir. 2006) (holding there was substantial evidence to support the ALJ's finding that the claimant performed a significant number of daily living activities and that he was capable of self-care because he drove, shopped, and ran errands). Thus, the court finds that the ALJ did not err in considering Rathke's daily activities to be inconsistent with his subjective complaints of pain and immobility.

### 5. Terry Rathke's Testimony

Fifth, Rathke argues that the ALJ erred because the ALJ did not mention Terry Rathke's testimony regarding Rathke's need for breaks, isolation, and absenteeism. Docket 24 at 32. "Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Here, the ALJ discussed Terry's testimony regarding Rathke's anxiety and social isolation. AR 1470. The ALJ also mentioned Terry's testimony regarding Rathke's forgetfulness to take his medication. AR 1479. Thus, given the ALJ's discussion of and reliance on Terry's hearing testimony in some of the opinion, the court finds it "highly unlikely that the ALJ did not consider and reject" other portions of Terry's testimony. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). Thus, the court finds that the ALJ did not err because she considered Terry Rathke's testimony throughout the opinion.

### 6. Deference to the ALJ

Lastly, Rathke urges the court to not give deferential treatment to the ALJ because the ALJ did not hear or see Rathke testify. Docket 24 at 33. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). The court must "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Schultz*, 479 F.3d at 983 (internal quotation and citations omitted). Though ALJ Kelley did not hear

Rathke testify, she did hear the medical experts and his wife, Terry, testify. *See* AR 1500-66. The ALJ was also able to read Rathke's testimony from previous hearings within the record. *See* AR 763-828; 1358-90. Additionally, the deferential standard applies regardless of whether the ALJ actually heard the testimony when the ALJ expressly discredits the claimant and gives good reasons for doing so. *See Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001). Here, the ALJ gave good and explicit reasons for discrediting some of Rathke's testimony. Thus, the court will give deference to the ALJ's findings.

## B. Combined Effects of Impairments

Finally, Rathke argues that the ALJ failed to consider the combined effects of Rathke's severe impairments in assessing his RFC. Docket 24 at 33-42. Rathke's arguments on this issue go through several medical expert's opinions and critiques the weight given to each opinion by the ALJ. *See id.* at 34-42. The court interprets Rathke's argument to be that the ALJ erred in her evaluation of the opinion evidence in the record. *See id.* at 33-42; Docket 27 at 12.

### 1. Dr. Falkenburg

Rathke argues that the ALJ impermissibly gave less than controlling weight to Rathke's treating physician, Dr. Falkenburg. Docket 24 at 34-35. A treating physician is a doctor with whom the patient "has, or has had, an ongoing treatment relationship[.]" 20 C.F.R. § 404.1502 (2011); 20 C.F.R. § 416.902 (2015). Here, the ALJ acknowledged that Dr. Falkenburg was Rathke's treating physician. AR 1488. A treating physician's opinion should

generally be given controlling weight if the opinion is " 'well-supported by medically acceptable' " diagnostic techniques and is consistent " 'with the other substantial evidence in the record.' " *Wildman*, 596 F.3d at 964 (quoting *Brown,* 390 F.3d at 540). But a treating physician's opinion is not automatically controlling because the ALJ must evaluate the record as a whole. *Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014); *Wagner*, 499 F.3d at 849. The ALJ can discredit or disregard the treating physician's opinion when the "opinion conflicts with other substantial medical evidence contained within the record" or when the treating physician's opinion is inconsistent and undermines the opinion's credibility. *Wagner*, 499 F.3d at 849 (citations omitted). The ALJ " 'may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.' " *Id.* (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000)).

The ALJ resolves conflicts between the various opinions and evaluation from treating and examining physicians. *Id.* at 848. In determining what weight to give any medical opinion, the ALJ should consider the following factors: "(1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) 'any factors [the applicant] or others bring[s] to [the ALJ's] attention.' " *Id.* (alteration in original) (quoting 20 C.F.R. § 404.1527(d)). The ALJ must provide "good reasons" for the weight given to the treating physician's opinion. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (citation omitted). "This requires the ALJ to explain in his

written decision, with some specificity, why he has rejected the treating physician's opinion." *Walker v. Comm'r*, 911 F.3d 550, 553 (8th Cir. 2018) (citing *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)).

The ALJ gave varying weight to the opinions of Dr. Falkenburg. *See* AR 1484-85, 1488-89. The ALJ gave controlling weight to Dr. Falkenburg's opinions when the opinions were consistent with substantial medical evidence in the record. *See* AR 1484 (noting Dr. Falkenburg's findings from December 2004 and February 2005 are consistent with Dr. Belzer's hearing testimony). The ALJ gave some of Dr. Falkenburg's opinions regarding Rathke's limitations minimal weight. *See* AR 1488-89. Overall, the ALJ gave less than controlling weight to Dr. Falkenburg's opinion when Dr. Falkenburg's findings and opinions were: (1) inconsistent with the medical evidence in the record; (2) inconsistent with her own opinions; and (3) inconsistent with the limitations alleged by Rathke. *See* AR 1484-85, 1489.

### a. Inconsistent with Other Evidence in the Record

In comparing Dr. Falkenburg's opinions to other medical evidence in the record, the ALJ found that Dr. Falkenburg's opinions were inconsistent with other medical evidence in the record. For example, the ALJ found Dr. Falkenburg's opinion in a February 2010 Temporary Assistance for Needy Family (TANF) form to be inconsistent with other medical evidence. AR 1484-85 (citing AR 1296-97). In the TANF form, Dr. Falkenburg stated that Rathke could walk, sit, and stand for two hours in an eight-hour workday; he would have no significant difficulty handling, grabbing, or grasping large objects; and

he could write, type, and handle small objects. AR 1296-97. Dr. Falkenburg recommended that he never push or pull beyond sedentary exertional limits. *Id.* On the same day as Dr. Falkenburg's 2016 TANF opinion, she saw Rathke who presented to the clinic for his chronic medical issues including hepatitis C and bipolar disorder. AR 1298. Dr. Falkenburg wrote that Rathke's bipolar disorder was debilitating and he was not able to hold down a job because "he stresses over things so much." *Id.* Dr. Falkenburg stated that his pain was generally managed by taking methadone. *Id.* She opined that the chronic pancreatitis and chronic abdominal pain would limit Rathke's functional capacity in a job setting, but he would be able to do some sedentary work for an hour or two per day. AR 1298-99.

The ALJ noted that Dr. Falkenburg's limitations were inconsistent with those of Dr. Belzer. AR 1483-84. Dr. Belzer stated that Rathke could have sat for six hours, stood/walked for four hours, reached overhead occasionally, reached in all direction continuously, pushed/pulled with upper extremities frequently, but not above shoulder level. AR 1546-47. In addition to Dr. Belzer's opinion, Dr. Greg Erickson found that Rathke could stand, walk, and sit for about six hours in an eight-hour workday. AR 1257. He also opined that Rathke had no limit on push or pull activities. *Id.* Overall, Dr. Erickson acknowledged the fact that Rathke was diagnoses with hepatitis C, but that it did not appear to be active at the time and did not include any limitations. *Id.* Additionally, Dr. Erickson observed Rathke's pain syndrome, but noted Rathke had normal range of motion and strength. *Id.* In 2011, Dr. Anne Winkler

opined that Rathke could sit for four hours at a time and eight hours in an eight hour workday, stand/walk for three hours at a time and six hours in a workday, occasionally reach with the right upper extremity, frequently with the left, and frequently able to reach in all other directions. AR 1346-50. Also, she stated that Rathke could continuously handle, finger, and feel bilaterally; Rathke could also continuously push and/or pull with the upper and lower extremities bilaterally. AR 1347. Overall, there was substantial evidence in the record to support the ALJ's finding that Dr. Falkenburg's limitations were inconsistent with the other evidence in the record. *See Wildman*, 596 F.3d at 964 (stating an ALJ can give limited weight to treating physicians opinion if inconsistent with the record or can discount/disregard the opinion when "other medical assessments are supported by better or more thorough medical evidence[.]"). The court finds that Dr. Falkenburg's opinions were inconsistent with other medical opinions in the record.

### b.     Inconsistent with Her Own Opinions

The ALJ also gave less weight to some of Dr. Falkenburg's opinion because Dr. Falkenburg issued several inconsistent opinions regarding Rathke's physical and mental functioning. AR 1485. Many of Dr. Falkenburg's opinions were inconsistent with her own medical records that showed Rathke had good results with medication management, control of his symptoms, and benign or unremarkable musculoskeletal/physical examinations. *Id.* And the ALJ "may discount or even disregard the opinion . . . where a treating

physician renders inconsistent opinions that undermine the credibility of such opinions." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).

Dr. Falkenburg filled out a form regarding Rathke's ability to do physical work-related activities in 2005. AR 673. In this form, Dr. Falkenburg stated that Rathke could stand and walk for an hour or four hours at a time, and stand an hour and walk for two hours during an eight-hour workday. AR 674. She wrote that Rathke could sit eight hours at one time without interruption and total in an eight-hour workday. *Id.* The ALJ noted that in this form itself, Dr. Falkenburg provided inconsistent opinions. AR 1488 (citing AR 674). A week after completing this form, Dr. Falkenburg released Rathke from the hospital with "unrestricted" activities. AR 676.

As to Dr. Falkenburg's findings on Rathke's mental work-related activities (AR 671-72), on February 3, 2005, Dr. Falkenburg stated that Rathke had marked limitations in his ability to understand, remember, and carry out short, simple instruction. AR 671. Dr. Falkenburg also found Rathke had "extreme" limitations in terms of understanding, remembering, and carrying out detailed instructions. *Id.* As to interacting with the public, supervisors, and coworkers, Dr. Falkenburg found that he had extreme limitations. AR 672. Dr. Falkenburg based her findings on Rathke's severe schizophrenia, anxiety, and depression, along with his chronic narcotics use and borderline mental functioning that made Rathke "dysfunctional." AR 671-72. Dr. Falkenburg made such findings even though she had not meet, seen, or treated Rathke in over a year. *See* AR 667, 671. The ALJ compared these findings to Dr.

Falkenburg's previous notes from January of 2004, where Dr. Falkenburg noted that Rathke's anxiety was controlled with medication. AR 668.

The ALJ discussed other reports from Dr. Falkenburg from July of 2008 to April 2010. AR 1484. In her July 2008 notes, Dr. Falkenburg observed that Rathke was doing well in terms of his chronic pain and his pain always remained well controlled on medication. AR 1219. In several medical reports from February of 2009 to April of 2010, Dr. Falkenburg noted that Rathke was pleasant, needed shoulder injections, was doing very well, and looked much better. AR 1290, 1304, 1310, 1313, 1315, 1321. The ALJ also compared Dr. Falkenburg's opinion in a March 2010 progress report to her February 2010 TANF opinion. In the March 2010 report, she stated that Rathke's pancreatitis continued to remain improved and described Rathke as doing very well, looking much better, and doing much better regarding his mental symptoms. AR 1484 (citing AR 1292). In her February 2010 TANF opinion, Dr. Falkenburg found Rathke's limitations to be very restrictive. *See* AR 1296-97 (finding Rathke could only sit, stand, and walk for two hours).

Additionally, the ALJ noted that Dr. Falkenburg's 2010 limitations were significantly increased from her 2006 limitations, although Rathke's symptom severity was increasing only nominally. AR 1484-85. *Compare* AR 1296-97 *with* AR 710-15. In the 2006 opinion, Dr. Falkenburg noted that Rathke could sit for five hours at a time and for eight hours in an eight-hour workday, stand for five hours, and walk for four hours. AR 711. She opined that Rathke could never reach overhead or push/pull with the right upper extremity, but could

occasionally reach overhead with the left extremity. AR 712. Rathke could also occasionally reach in all other directions bilaterally, occasionally handle, continuously finger and feel, and frequently push/pull with lower extremities bilaterally. *Id.*

Over all, substantial evidence in the record supports the ALJ's finding that some of Dr. Falkenburg's opinions were inconsistent with her other opinions. *See Krogmeier*, 294 F.3d at 1023 (finding substantial evidence in the record support the ALJ's decision not to give controlling weight to the treating physician because the physician's opinion was inconsistent with the physician's contemporaneous treatment notes).

### c. Inconsistent with Rathke's Testimony

The ALJ also compared Dr. Falkenburg's limitations to those stated by Rathke at the 2005 and 2006 hearings. AR 1484-85. Rathke testified that he could walk up and down stairs, he was able to stop, kneel, bend, and squat. AR 778, 821. He testified that he was able to handle and manipulate objects with his hands, he was able to write and most of the time, and could open jars, doors, etc. AR 777, 821. Additionally, Rathke testified in 2006 that his ability to reach had improved in his right upper extremity to the point that he was able to reach overhead. AR 809, 821, 1479. Dr. Falkenburg's limitations, therefore, are also inconsistent with the daily activities testified to by Rathke discussed earlier in this opinion. Thus, substantial evidence in the record supports the ALJ's finding that Dr. Falkenburg's limitations were inconsistent with Rathke's abilities.

Overall, the ALJ properly discounted Dr. Falkenburg's opinions when the opinions were inconsistent with her own treatment notes, inconsistent with substantial medical evidence in the record, and inconsistent with Rathke's own testimony and opinion on his inabilities and daily activities. It should also be noted that the ALJ did not disregard Dr. Falkenburg's opinions in their entirety; the ALJ gave little weight to some opinions but also relied on Dr. Falkenburg's other opinions throughout her opinion. *See Julin*, 826 F.3d at 1089 (noting the ALJ did not reject the physician's opinion in its entirety because the ALJ gave substantial weight to the opinions that were not conclusory or based on the claimant's discredited subjective complaints); *see also Casey*, 503 F.3d at 692 (noting the ALJ did not reject all of the treating source's opinions). All three reasons provided by the ALJ as to why she partially discounted some of Dr. Falkenburg's opinions are supported by substantial evidence in the record. Thus, the court finds that the ALJ did not err in discounting some of Dr. Falkenburg's opinions.

### 2. Dr. Dang

Next, Rathke argues that the ALJ did not provide a rationale for discrediting Dr. Tobias Dang. Docket 24 at 36. The ALJ gave significant weight to some of Dr. Dang's opinion, but minimal weight to Dr. Dang's opinion on Rathke's ability to perform only part-time work. AR 1488 (citing AR 602-06). The court rejects Rathke's argument that the ALJ did not provide reasoning for giving such weight to Dr. Dang's opinion.

The ALJ explicitly stated that she gave Dr. Dang's part-time work opinion minimal weight because Dr. Dang did not have the opportunity to see Rathke or review any records after July 2003. *Id.* In his report, Dr. Dang noted that he reviewed a document from 2002 and 2003. AR 602. The record before this court is quite extensive and the relevant time period extends well beyond 2003. *See* AR 602-06. Dr. Dang's opinion does not incorporate any information beyond 2003. The ALJ also noted that this portion of Dr. Dang's opinion was based on Rathke's own report of poor energy and subjective complaints rather than objective medical evidence. AR 1488 (citing AR 606). An ALJ is entitled to give less weight to a medical opinion when it is based heavily on an individual's own subjective complaints. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (stating the ALJ was entitled to give less weight to physician's opinion because it was based largely on claimant's subjective complaints rather than on objective medical evidence). Thus, the court finds that the ALJ did not err in giving minimal weight to a portion of Dr. Dang's opinion because the ALJ provided a specific, permissible reason.

### 3. Dr. Gilbertson

Rathke argues that the ALJ rejected Dr. Jackie Gilbertson's ultimate opinion because Dr. Gilbertson considered Rathke's physical symptoms in her opinion. Docket 24 at 36. Dr. Gilbertson performed a consultative psychological examination on June 1, 2009. AR 1229-32. The ALJ gave significant weight to Dr. Gilbertson's opinions pertaining to her psychological examination of Rathke. AR 1489. The ALJ, however, gave minimal weight to her opinion

relating to the incorporation of Rathke's physical impairments. *Id.* The ALJ stated that Dr. Gilbertson's comments on Rathke's impairments were outside her area of specialty. *Id.* As stated earlier, where a medical source provides an opinion outside his or her specialty, the opinion is generally entitled to less weight. *See Brown*, 611 F.3d at 953. Thus, this is a permissible explanation by the ALJ in giving less weight to this portion of the expert's opinion because Dr. Gilbertson's specialty is mental health and her statements regarding a topic outside her specialty is entitled to less weight. *See Wright*, 789 F.3d at 855 (stating the ALJ "was within his purview not to give these observations much weight because they were not from specialists in the [specific] health field."). The court finds that the ALJ did not err in giving minimal weight to part of Dr. Gilbertson's opinion concerning an area of medicine outside of Dr. Gilbertson's specialty.

### 4.    **Dr. Dickerson**

Next, Rathke argues that the ALJ erred in rejecting Dr. James A. Dickerson's opinion. Docket 24 at 37. The ALJ gave minimal weight to Dr. Dickerson's opinion that Rathke's mental symptoms were at a listing level severity. AR 1491. The ALJ provided two reasons for giving this level of weight. *Id.* First, the ALJ stated that Dr. Dickerson's opinion relied on Rathke's subjective reports regarding his daily activities. *Id.* Here, the ALJ was justified in discrediting this opinion because the court previously found that Rathke's daily activities were inconsistent with his subjective complaints. *See Julin*, 826 F.3d at 1089 (holding that the ALJ "permissibly declined to give controlling

weight to [the treating doctor's] opinions on [claimant's] work-place limitations[]" that "relied on [claimant's] subjective complaints" of depression and anxiety when the ALJ had found the claimant not credible); *see also Papesh v. Colvin*, 786 F.3d 1126, 1132-33 (8th Cir. 2015) (holding that the ALJ's finding that the treating doctor's opinion "appears to be based on the claimant's subjective assertions of pain" was a "potential bas[i]s to not give controlling weight to [the] opinion").

Second, the ALJ stated that Dr. Dickerson's opinion was inconsistent with other mental health experts. AR 1491. The court previously found that substantial evidence in the record supported Dr. Moore's opinion that Rathke's mental health impairments did not meet any listings. Thus, the ALJ permissibly discounted Dr. Dickerson's opinion because it was inconsistent with substantial evidence in the record. *See Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians . . . . The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."). The court finds that the ALJ did not err in giving minimal weight to a portion of Dr. Dickerson's opinion.

### 5.    Dr. Belzer

Rathke argues that the ALJ's rejection of Dr. Belzer's opinion is not supported by substantial evidence in the record. Docket 24 at 37. The court has already addressed this argument in step three. The court found that the

ALJ's findings regarding Dr. Belzer's later opinion were supported by substantial evidence in the record. Additionally, the court found that the ALJ provided permissible reasons for discounting Dr. Belzer's later opinion. Thus, the court finds that the ALJ did not err in giving minimal weight to Dr. Belzer's inconsistent later opinion.

### 6. Dr. Moore and Dr. Pelc

Next, Rathke attacks the validity of Dr. Moore and Dr. Pelc's opinions and the ALJ's decision to give more weight to these opinions rather than Dr. Belzer's. Docket 24 at 39. Rathke argues that the ALJ erred when she relied on non-examining doctors and found that their opinions do not constitute substantial evidence. *Id.* at 39, 42.

It is the ALJ's task "to resolve the differences between . . . consultative evaluations in the light of the objective evidence." *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010). Here, the ALJ considered all the evidence in the record and found that substantial evidence in the record supported Dr. Moore and Dr. Pelc's opinions. Although Dr. Moore and Dr. Pelc are consulting medical experts and not Rathke's treating physicians, the ALJ can rely on consulting physicians' opinions in deciding the claimant's disability. *See Hight v. Shalala*, 986 F.2d 1242, 1244 n.1 (8th Cir.1993) (opinions of consulting physicians may constitute substantial evidence). As stated before, the ALJ permissibly discredited Dr. Belzer's later opinion because it was inconsistent with his own earlier opinion and with substantial evidence in the record. *See Pearsall*, 274 F.3d at 1219 ("It is the ALJ's function to resolve conflicts among

the opinions of various treating and examining physicians . . . . The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."). This court will not rehash which doctors' opinions are more credible than another's. This court's standard of review is whether there is substantial evidence in the record to support the ALJ's finding. *See Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). And this court has found that substantial evidence has supported all of the ALJ's decisions as to the weight the ALJ gave to each medical opinion.

Rathke also argues that the ALJ failed to consider Dr. Pelc and Dr. Moore's opinions that Rathke's severe psychological conditions were aggravating his perception of pain. Docket 24 at 40. An ALJ is not required to discuss all the evidence, and failure to cite specific evidence does not indicate it was not considered. *See Craig*, 212 F.3d at 436 ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). Here, the ALJ gave significant weight to Dr. Moore and Dr. Pelc's opinions. AR 1476, 1490. Thus, given the ALJ's explicit reliance on a majority of these two doctors' opinions, the court finds it " 'highly unlikely that the ALJ did not consider and reject' those portions of [their] report[s] that [plaintiff] now points to in support of her appeal." *Craig*, 212 F.3d at 436 (quoting *Black*, 143 F.3d at 386). Thus, the court's rejects Rathke's argument

that the ALJ did not consider these portions of Dr. Pelc and Dr. Moore's opinions.

Rathke argues that Dr. Pelc and Dr. Moore did not review the function exhibits and did not consider all of Rathke's impairments in combination in their opinions. Docket 24 at 38, 42. Although Dr. Moore did not review all the evidence prior to the hearing, she did have the opportunity to review all the available medical evidence and Dr. Dickerson's evaluation prior to her completion of her post-hearing medical interrogatories. AR 1471. Thus, the court rejects this argument. The court finds that the ALJ properly consider all the experts' opinions and gave the proper weight to opinions.

### 7.     Medical Opinions as to Rathke's Combined Impairments

Lastly, Rathke relies on *Colhoff v. Colvin*, No. 5:13-CV-05002-JLV, 2014 WL 1123518 (D.S.D. Mar. 20, 2014) in support of her argument that the ALJ did not consider the combination effect of Rathke's impairments. Docket 24 at 38. In *Colhoff*, the court found that the ALJ erred in relying on the opinions of several doctors in determining whether the claimant's severe impairments met or equaled a listing. *Colhoff*, 2014 WL 1123518, at *7. The court found that the doctors' opinions did not consider the claimants other alleged impairments, including his general anxiety disorder, his chronic pain syndrome, and his major depressive disorder or that these conditions were diagnosed by the treating physicians. *Id.* The court held that the opinions of the doctors were not substantial evidence and reversed the decision of the ALJ. *Id.*

The present case is distinguishable from *Colhoff*. Here, the ALJ relied on medical opinions from Dr. Moore, Dr. Belzer, Dr. Falkenburg, Dr. Winkler, Dr. Dang, Dr. Gilbertson, Dr. Dickerson, and Dr. Pelc. AR 1471-91. The ALJ considered medical opinions from mental health specialists, pulmonary specialists, and general care doctors. *See id.* Also, unlike the opinions in *Colhoff*, Dr. Moore's opinions incorporated all of Rathke's noted mental impairments—depression, anxiety, and personality disorder. AR 1471-76. Dr. Moore even discussed the possible existence of an organic medical disorder, although she ultimately did not find it to be substantiated. AR 1472. Dr. Pelc's opinion also contained reference to both Rathke's mental issues and the impact of Rathke's physical problems. *See* AR 1332-38, 1370. Dr. Pelc testified that psychological problems can exacerbate physical health difficulties, yet that did not change his limitations regarding Rathke. AR 1370. Also, Dr. Erickson noted in his completion of the work-related physical activity form that Rathke had a history of mental illness that affected his subjective physical limitations. AR 1258, 1261. It should be noted that the ALJ did not completely disregard the experts' opinions that incorporated both mental and physical impairments. Instead, she gave it minimal weight, which means the ALJ still considered them in her overall opinion. Thus, the substantial evidence in the record supports the ALJ's determinations and the weight given to each medical opinion.

## CONCLUSION AND ORDER

The court finds that the ALJ's finding was supported by substantial evidence in the record as a whole. Thus,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

DATED March 30, 2020.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE